IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTIRCT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BELLSOUTH TELECOMMUNICATIONS, INC., d/b/a AT&T Tennessee, Plaintiff, v. THE TENNESSEE REGULATORY AUTHORITY, et al., Defendant. | NO. 3:08-00059 JUDGE HAYNES |

**MEMORANDUM**

Plaintiff, Bellsouth Telecommunications, Inc. d/b/a AT&T Tennessee ("AT&T"), filed this action under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 47 U.S.C. § 252(e)(6) against the Defendants: the Tennessee Regulatory Authority, Eddie Roberson, Sara Kyle, and Ron Jones in their official capacities as TRA members. Plaintiff challenges Defendants' authority to issue certain orders under § 271 of the Federal Telecommunications Act of 1996 ("Act") and seeks declaratory and injunctive relief against the Defendants to enjoin the enforcement of those Orders.

This action arises out of two federal and state administrative proceedings in 2004. In a prior proceeding, Plaintiff sought to address recent decisions of the Federal Communications Commission ("FCC")[1] and the District of Columbia Circuit[2] on the FCC's implementation of the

---

[1] Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability, CC Docket 01-338, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978 (2003), as modified by Errata, 18 FCC Rcd. 19020 (2003),

1

Federal Telecommunications Act of 1996 ("Act"). 47 U.S.C. § 151, et seq. Defendant TRA instituted a proceeding in 2004 to address the effect of the FCC's Triennial Review Order ("TRO") and the D.C. Circuit's decision on existing interconnection agreements between Plaintiff and competing carriers. Subsequently, the TRA expanded its proceeding to incorporate the determinations in the FCC's 2005 Triennial Review Remand Order. On November 28, 2007, the TRA issued its final Order requiring Plaintiff to grant access to a line splitter and fiber-optic cable and disallowed Plaintiff's imposition of termination fees. Order, No. 04-00381 (TRA Nov. 28, 2007).

After this action was filed, there was a related proceeding before the FCC that resulted in a stay of these proceedings. Plaintiff later filed a notice of its withdrawal from that proceeding. The Court ordered a filing of the administrative record before the TRA and a filing of briefs on the parties' claims and contentions.

The primary issue here involves the TRA's regulatory authority under the Federal Telecommunications Act of 1996, 47 U.S.C § 151 et seq., and the decisional law interpreting the Act since the TRA deliberated on these issues in 2006. A brief background of the Act and its historical evolution provide an important context to review TRA's decisions.

---

vacated in part, U.S. Telecom. Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004) ("Triennial Review Order" or ("TRO"); Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, CC Docket No. 01-338, WC Docket No. 04-313, Order and Notice of Proposed Rulemaking, 19 FCC Rcd. 16783 (2004) ("Interim Rules Order"). The TRO was filed as Attachment C to the Plaintiff's brief.

[2] United States Telecom Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004).

Historically, States regulated local telephone service within its territorial limits, but that regulation created local monopolies that in 1982 resulted in the divestiture by AT&T of its subsidiaries, the Bell Operating Companies ("BOCs"), that were precluded from entering the long-distance market. United States v. Am. Tel. & Tel. Co., 552 F. Supp. 131, 222-25 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983); see also SBC Commc'ns, Inc. v. FCC, 138 F.3d 410, 412 (D.C. Cir. 1998) ("Divestiture was called for, in large part, because it was thought that a corporation that enjoyed a monopoly on local calls would ineluctably leverage that bottleneck control in the interexchange (long distance) market."). The AT&T consent decree contemplated a dual telephone service market with new entrants in the long-distance market, and the BOCs as local service monopolies.

In 1996, Congress enacted the Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. (the "Act").

> [The Act] sought to foster a competitive market in telecommunications. To enable new firms to enter the field despite the advantages of the incumbent local exchange carriers ("ILECs"), the Act gave the Federal Communications Commission broad powers to require ILECs to make "network elements" available to other telecommunications carriers, id. §§ 251 (c)(3), Cd), most importantly the competitive local exchange carriers ("CLECs"). The most obvious candidates for such obligatory provision were the copper wire loops historically used to carry telephone service over the "last mile" into users' homes. But Congress left to the Commission the choice of elements to be "unbundled," specifying that in doing so it was to
>
> > consider, at a minimum, whether ... the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.
>
> Id. § 251(d)(2) (emphasis added).

United States Telecomm. Ass'n v. FCC, 359 F.3d 554, 561 (D.C. Cir. 2004).

3

Sections 251, 252 and 271 of the Act created a role for state regulatory agencies and allowed BOCs to compete in the long distance market.

> Sections 251 and 252 of the Act require former monopoly local carriers to enter into interconnection agreements that provide the new competitors with access to some of their telecommunications components on an unbundled basis and on terms favorable to the competitors. Meanwhile, Section 271 allows local phone companies that used to be subsidiaries of AT&T previously barred by an antitrust decree from entering the long-distance market, to supply long-distance services if their interconnection agreements contain certain access provisions. The Act explicitly authorizes state commissions to play a crucial, but restricted, role in this process, while reserving the power to administer various parts of the Act exclusively to the Federal Communications Commission.

Qwest Corp. v. Arizona Corp. Comm'n, 567 F.3d 1109, 1111 (9th Cir. 2009).

The Sixth Circuit described the Act's principal purpose to promote competition through federal and state regulation.

> [The Act] has been called one of the most ambitious regulating programs operating under "cooperative federalism," and creates a regulatory framework that gives authority to state and federal entities in fostering competition in local telephone markets. We have often reiterated the Act's purposes, which are ending local telephone company monopolies and promoting competition in local telephone markets.

Michigan Bell Telephone Co. v. MCIMetro Access Transmission Services, Inc., 323 F.3d 348 (6th Cir. 2002) (internal citation omitted).

Congress required ILECs to offer their services to competitors or new entrants at wholesale rates. Forty seven U.S.C. § 251(c)(4) requires ILECs to interconnect with new entrants that elected to construct their own networks. "Interconnection" allows the customers of the competitor to communicate with the incumbent provider's customers. Without interconnection and the associated reciprocal compensation mechanisms, a competitor's network would not be useful to potential customers. Congress also required several elements of ILECs local networks (including the features, functions and capabilities of these elements) to be leased

4

by competitors on an "unbundled" basis. 47 U.S.C. § 251(e)(3) and (d)(2). Congress authorized state regulatory commissions to review and administer the interconnection agreements between ILECs and CLECs. Congress also authorized state commissions to impose additional state regulatory requirements consistent with the 1996 Act or FCC rules and regulations. 47 U.S.C. §§ 251(d)(3); 252(e)(3). The 1996 Act granted state commissions authority to arbitrate interconnection agreement disputes between an ILEC and a CLEC. 47 U.S.C. § 252(b). If a party disagrees with the state commission's decision, the aggrieved party could seek review in the federal district court. 47 U.S.C. § 252(e)(6).

Under the Act, the FCC promulgated regulations that caused extensive litigation, and in the interim, state commissions, such as the TRA, interpreted and implemented the Act under FCC rules and court decisions. The FCC's first regulations were issued in August of 1996 in the *First Report and Order. In re Implementation of the Local Competition Provisions in the Telecommunications Act of* 1996, 11 FCC Red. 15499 (1996). In January 1999, the Supreme Court determined that certain FCC regulations were unlawful and remanded the regulations to the FCC for further proceedings. AT&T Corp v. Iowa Utilities Bd., 525 U.S. 366 (1999).

In November 1999, the FCC issued new regulations and on May 24, 2002, the D.C. Circuit held that a part of those regulations were unlawful and remanded issues to the FCC for further proceedings. United States Telecom Ass'n v. FCC, 290 F.3d 415 (2002) ("USTA I"). On August 21, 2003 the FCC issued its Triennial Review Order ("TRO"), In the matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 FCC Red. 16978 (2003), with new regulations, but the D.C. Circuit vacated certain portions of the TRO regulations. United States Telecom Ass'n v. FCC, 359 F.3d 554 (2004) ("USTA II"). After the remand in 2005, the FCC issued its current set of unbundling rules in the TRO, Order

on Remand, In re Unbundled Access to Network Elements, 20 FCC Rcd. 2533, 2005 WL 289015 (Feb. 4, 2005), that were affirmed in 2006. Covad Comms. Co. v. FCC, 450 F.3d 528 (D.C. Cir. 2006).

The Act specifically states that "this Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly provided in such Act or amendments." Telecommunications Act of 1996, § 601(c)(1), 47 U.S.C.A. § 152 note (1997). Congress included this provision to prevent "affected parties from asserting that the bill impliedly pre-empts other laws." House Conference Report No. 104-458, 104th Cong., 2d Sess., 201, reprinted in 1996 U.S.C.C.A.N. 124, 215. With specific reference to the interconnection issue, the Act also states that it should not be construed to prohibit state commissions from enforcing or promulgating regulations or from imposing additional requirements that "are necessary to further competition in the provision of telephone exchange service or exchange access" as long as they are "not inconsistent" with the Act. See 47 U.S.C. § 261(b), (c) (1997).

The TRA's Order at issue here relied upon a 2006 version of the FCC's rules, and the Sixth Circuit has not addressed the interface between § 271 and Tennessee law. Under Tennessee law and the FCC's current regulations, the TRA's "actions must be harmonious and consistent with its statutory authority." Tennessee Cable Television Ass'n v. Tennessee Pub. Service Comm'n, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992). Tenn. Code Ann. § 65-4-106 grants the TRA jurisdiction over public utilities as may be necessary for the purpose of carrying out the provision of this chapter. Tennessee law requires "a liberal construction, and any doubt as to the existence or extent of a power conferred on the authority by this chapter or chapters 1,

3, and 5 of this title shall be resolved in favor of the existence of the power. . . ." Tenn. Code Ann. § 65-4-106.

On July 1, 2004, Plaintiff filed an Emergency Petition for Declaratory Ruling and Preemption of State Action ("Petition") with the FCC, seeking an order preempting the TRA's orders at issue in this action. The FCC did not act on Plaintiff's Petition, and on April 29, 2008, Plaintiff filed a voluntary withdrawal of the Petition before the FCC.

As all corollary administrative proceedings in this action have concluded, the four issues before the Court are as follows:

> 1. Does the TRA have authority to require Plaintiff to include terms and conditions for § 271 elements in its interconnection agreements with competitors under § 252?
>
> 2. Does the TRA have authority to require Plaintiff to provide competitors with access to a facility known as a "splitter," which allows two different services to be carried over the same line?
>
> 3. Does the TRA have authority to require Plaintiff to unbundle greenfield fiber DS1 and DS3 loops serving enterprise markets?
>
> 4. Does the TRA have authority to prohibit Plaintiff from charging competitors termination, reconnection, or disconnection fees when a competitor converts a facility or service from special access to unbundled network elements ("UNEs")?

Plaintiff's challenges to the TRA's Order is that the TRA misinterpreted or misapplied federal law.

Federal courts do not defer to state commissions such as the TRA regarding the meaning of federal law. The Court thus reviews the TRA's interpretation and application of federal law de novo and applies "arbitrary and capricious" review to the TRA's findings of fact. Michigan Bell Tel. Co. v. Covad Communications Co., 597 F.3d 370, 375 (6th Cir. 2010).

### A. TRA Authority to Implement § 271

7

Every federal court of appeals to address this question has held that "the FCC has exclusive jurisdiction over § 271," Southwestern Bell Tel., L.P. v. Missouri Pub. Serv. Comm'n, 530 F.3d 676, 683 (8th Cir. 2008), and "state commissions do not possess power to determine or enforce Section 271 requirements," Qwest, 567 F.3d at 1116 n.9; accord BellSouth Telecomms., Inc. v. Georgia Pub. Serv. Comm'n, 555 F.3d 1287, 1288 (11th Cir. 2009) (per curiam) (states "lack[] authority pursuant to either federal or state law to implement 47 U.S.C. § 271"); Illinois Bell Tel. Co., Inc. v. Box, 548 F.3d 607, 611-13 (7th Cir. 2008) (Posner, J.); Verizon New England, Inc. v. Maine Pub. Utils. Comm'n, 509 F.3d 1, 7-9 (1st Cir. 2007). District courts in this Circuit and other circuits have reached the same conclusion. BellSouth Telecomms., Inc. v. Kentucky Pub. Serv. Comm'n, No. 06-65-KKC, 2007 WL 2736544, at *6-*7 (E.D. Ky. Sept. 18, 2007) (holding that the Kentucky PSC "had no authority to act pursuant to § 271"); BellSouth Telecomms., Inc. v. Kentucky Pub. Serv. Comm'n, 613 F. Supp. 2d 903, 906 (E.D. Ky. 2009); Michigan Bell Tel. Co. v. Lark, No. 06-11982, 2007 WL 2868633, at *6 (E.D. Mich. Sept. 26, 2007) ("Section 271 grants oversight authority to the FCC, but not to the state public utility commissions."), aff'd on other grounds sub nom. Michigan Bell Tel. Co. v. Covad Communications Co., 597 F.3d 370 (6th Cir. 2010), cert. granted on other grounds, Nos. 10-313, 10-329, 2010 WL 3525697 (U.S. Dec. 10, 2010); Dieca Communications, Inc. v. Florida Pub. Serv. Comm'n, 447 F. Supp. 2d 1281, 1285-86 (N.D. Fla.); BellSouth Telecomms., Inc. v. Mississippi Pub. Serv. Comm'n, 368 F. Supp. 2d 557, 565-66 (S.D. Miss. 2005); Momentum Telecom, Inc. v. Alabama Pub. Serv. Comm'n, 2008 WL 192853, at *5 (M.D. Ala. 2008) ("Now, more courts...have addressed the issue and determined that state public service commissions cannot regulate rates for § 271 elements.") (collecting cases). The FCC has also stated that Congress granted "sole authority to the [FCC] to administer . . . section 271."

Memorandum Opinion and Order, *Application for Review and Petition for Reconsideration or Clarification of Declaratory Ruling Regarding US West Petitions To Consolidate LATAs in Minnesota and Arizona*, 14 FCC Rcd 14392, 14400-01, ¶¶ 17-18, 1999 WL 674804 (1999).

Given the overwhelming trend of federal precedents on this issue, the Court deems further analysis of § 271 preemption issue unnecessary. The Court concludes that the TRA lacks the authority to enforce provisions of § 271 that are the exclusive province of the FCC. Accordingly, Plaintiff's request for relief as to the § 271 preemption issues should be granted. The Court notes, however, that the TRA is not precluded from providing advisory opinions to the FCC as to the enforcement of § 271 provisions under 47 U.S.C. § 271(d)(2)(B) and as reflected in TRA proceedings. See Docket Entry No. 45-2, Attachment B, Advisory Opinion to the FCC.

### B. Line Splitters

The TRA Order at issue required Plaintiff to provide line splitters to competitive LECs. The FCC's regulation on line splitting requires ILECs to provide competitors with "the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated at the central office." 47 C.F.R. § 51.319(a)(1)(ii). The FCC has previously reviewed the facilitation of line splitting by competitors. The FCC considered and "disagree[d] with" the argument that LECs "must provide splitters for voice competitive LECs that seek to engage in line splitting." Memorandum Opinion and Order, *Joint Application by SBC Communications, Inc., et al., Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Arkansas and Missouri*, 16 FCC Rcd 20719, at 20772, ¶ 106, 2001 WL 1456806 (2001); see also Memorandum Opinion and Order, *Application by SBC Communications Inc., et al., Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Texas*, 15 FCC Rcd 18354, at 18516, ¶ 327, 2000 WL

870853 (2000) ("The [FCC] has never exercised its legislative rulemaking authority under section 251(d)(2) to require incumbent LECs to provide access to the splitter, and incumbent LECs therefore have no current obligation to make the splitter available."). Subsequently, the FCC "reaffirm[ed]" that ILECs must permit competitors "to engage in line splitting where a competing carrier purchases the whole loop and provides its own splitter to be collocated in the central office." TRO, 18 FCC Rcd at 17130, ¶ 251 (emphasis added).

The Triennial Review Order does not suggest that an ILEC must provide splitters. Instead, the regulation requires only that an ILEC provide competitors "with the ability to engage in line splitting arrangements." TRO, 18 FCC Rcd at 17130, ¶ 251 (emphasis added). The TRO also reaffirmed the FCC's rule "allowing" incumbents to maintain control over the splitter. Id. at 17130, ¶ 252 (emphasis added). Although ILECs are allowed to control the splitter, this language does not suggest they must control the splitter, further implying that ILECs need not furnish the splitter. If the ILEC were required to provide the splitter, it would render ineffective the FCC's reference to splitters "collocated at the central office," as collocation refers to a CLEC placing "its own equipment to be used for interconnection or access to unbundled network elements within or upon [the] incumbent LEC's premises." 47 C.F.R. § 51.5 (emphasis added); see also GTE Serv. Corp. v. FCC, 205 F.3d 416, 419 (D.C. Cir. 2000) (reviewing rules for "collocation of competitors' equipment").

Defendants fail to offer any persuasive arguments to set aside the FCC's prior holding that CLECs should provide their own splitter to be collocated at the ILECs' offices. While the TRA may certainly require Plaintiff to allow competitors to engage in line splitting, the TRA lacks authority to require ILECs to furnish the splitters themselves, as the FCC holdings preempt

the TRA's Order. Thus, the Court concludes that Plaintiff's request for relief as to the requirement for Plaintiff to provide line splitters should be granted.

## C. Greenfield Fiber Loops

A "greenfield" construction involves deployment of telecommunications facilities to customers that previously have not been served by any such facilities. See TRO, 18 FCC Rcd at 17117, ¶ 227. Any telecommunications carrier that seeks to serve customers at such premises must deploy entirely new infrastructure and equipment. The FCC's rule on fiber loops that are deployed to greenfields provides: "An incumbent LEC is not required to provide nondiscriminatory access to a fiber-to-the-home loop or a fiber-to-the-curb loop on an unbundled basis when the incumbent LEC deploys such a loop to an end user's customer premises that previously has not been served by any loop facility." 47 C.F.R. § 51.319(a)(3)(ii); see also TRO, 18 FCC Rcd at 17142, ¶ 273 ("Incumbent LECs do not have to offer unbundled access to newly deployed or 'greenfield' fiber loops.").

The FCC has twice issued corrections to its orders to confirm that § 51.319(a)(3)(ii) applies to all types of loops. Errata, *Review of the Section 251 Unbundling Obligations of Local Exchange Carriers*, 18 FCC Rcd 19020, 2003 FCC LEXIS 5066 (2003); Errata, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338 et al., ¶ 11 (FCC rel. Oct. 29, 2004).

The TRA held that the unbundling exclusion for new fiber loops applies only to DS0 loops serving mass market customers and that Plaintiff remains obligated to unbundle new fiber loops for DS1 and DS3 loops used by enterprise customers. The TRA relied on the separate unbundling regulation that governs DS1 and DS3 loops generally. 47 C.F.R. § 51.319(a)(4)-(5) (mandating unbundling of DS1 and DS3 loops based on certain characteristics of the local wire

11

center); Order at 59-60 ("[Plaintiff] has a continuing obligation to make available DS1 and DS3 UNE loops in the enterprise market where impairment exists. This includes the obligation to make available greenfield fiber DS1 and DS3 UNE loops serving enterprise markets[.]").

The issue here concerns whether the FCC's general rule on unbundling of enterprise loops or the specific exception to unbundling for greenfield fiber loops governs. The TRA argues that prior FCC position statements mandate unbundling of DS1 and DS3 loops even in the greenfield context. Plaintiff counters that the purposes of the Act, the principles of statutory interpretation and the subsequent FCC amendments on greenfield fiber-loop placement make clear that the FCC no longer requires unbundling for any types of loops placed in greenfield developments.

From the Court's review, only one other court has considered this issue. In determining that deployment of greenfield fiber loops does not require unbundling regardless of the type of loop involved, the Eastern District of Kentucky reasoned as follows:

> The over-arching goal of the 1996 Act is to promote competition and encourage the rapid deployment of new telecommunications technologies. See 1996 Act. The Commission asserts that, due to the high cost to deploy local loops using fiber optic cable, it is not economically feasible for a competitive LECs to compete within a Greenfield enterprise area because a competitive carrier would be forced to build its own identical network. However, the Court finds this assertion to be incorrect. The cost would be the same to an incumbent LEC and a competitive LEC to deploy a DS1/DS3 loop using fiber optic cable to an end user's customer premise that previously has not been served by any loop facility. The recovery cost would also be the same. When connecting a new customer to the telecommunication network, the 1996 Act encourages the deployment of new technologies. It would not appear that AT & T Kentucky would spend substantial sums deploying DS 1/DS3 loops using fiber optic cable if it would then be required to provide nondiscriminatory access to its competitors.
>
> In summary, an incumbent LEC is still obligated to unbundle DS 1/DS3 loops consistent with 47 C.F.R. § 51.319(a)(4) and (5), regardless of the loop medium employed. However, if the DS1/DS3 loop is made of fiber optic cable and the end user's customer premise has not previously been served by any loop facility, AT

& T Kentucky is not obligated to unbundle. An incumbent LEC is not required to provide access to hybrid loops for broadband services but is required to provide access to the features, functions, and capabilities of their hybrid loops.

BellSouth Telecomms., Inc. v. Kentucky Pub. Serv. Comm'n, 693 F. Supp. 2d 703, 722 (E.D. Ky. 2010).

The TRA Order on unbundling raises concerns of whether actual competition exists in this market and whether the competitive LECs have access to the substantial sums necessary to enter this fiber optic market. Such costs may pose a significant barrier to entry into the greenfield enterprise market. Yet, given the FCC's repeated amendments emphasizing that unbundling is no longer required for all types of greenfield development, the Court is compelled to conclude that the TRA exceeded its authority in requiring Plaintiff to unbundle new fiber loops for DS1 and DS3 loops used by enterprise customers. Accordingly, Plaintiff's request for relief as to the requirement for Plaintiff to unbundle DS1 and DS3 loops should be granted.

## D. Termination Fee Provisions

Finally, Plaintiff challenges the TRA's order specifying that Plaintiff may not charge termination or disconnection fees when a competitor converts a facility or service from special access to unbundled network elements ("UNEs"). Plaintiff argues that the TRA lacks the authority to disallow termination fees due to the fees provided in Plaintiff's federal tariff approved by the FCC. The TRA relies on Paragraph 587 of the FCC's TRO that provides:

> We decline to require incumbent LEC's provide requesting carriers an opportunity to supersede or dissolve existing contractual agreements through a conversion request. Thus, to the extent a competitive LEC enters into a long-term contract to receive discounted special access services, such competitive LEC cannot dissolve the longterm contract based on a future decision to convert the relevant circuits to UNE combinations based on changes in customer usage. We recognize, however, that once a competitive LEC starts serving a customer, there exists a risk of wasteful and unnecessary charges, such as termination charges, re-connect and disconnect fees, or non-recurring charges associated with establishing a service

for the first time. We agree that such charges could deter legitimate conversions from wholesale services to UNEs or UNE combinations, or could unjustly enrich an incumbent LEC as a result of converting a UNE or UNE combination to a wholesale service. <u>Because incumbent LECs are never required to perform a conversion in order to continue serving their own customers, we conclude that such charges are inconsistent with an incumbent LEC's duty to provide nondiscriminatory access to UNEs and UNE combinations on just, reasonable and nondiscriminatory rates, terms, and conditions. Moreover, we conclude that such charges are inconsistent with section 202 of the Act, which prohibits carriers from subjecting any person or class of persons (e.g., competitive LECs purchasing UNEs or UNE combinations) to any undue or unreasonable prejudice or disadvantage.</u>

TRO, 18 FCC Rcd at 17349, ¶ 587 (emphasis added with footnotes omitted).

The plain language of the TRO thus provides authority to state regulatory agencies for the prohibition of termination, reconnection, or disconnection fees in the conversion of special access circuits to UNE pricing. Other courts in this circuit that have addressed this issue have found ample authority for the state regulatory agency to prohibit termination fees. <u>Michigan Bell Tele. Co. v. Level 3 Communications, LLC</u>, 218 F. Supp. 2d 891, 897-98 (E.D. Mich. 2002). There, the district court found that the FCC allows for "appropriate" termination penalties, but determined that the Michigan Public Service Commission could prohibit the ILEC from charging termination fees for special access service conversions to loop-transport UNE combinations. <u>Id.</u>

Plaintiff argues that paragraph 694 of the TRO justifies the imposition of termination fees. Paragraph 694 states that "any substitution of unbundled network elements for special access would require the requesting carrier to pay any appropriate termination penalties required under volume or term contracts." While Plaintiff asserts that this provision renders the TRO contradictory, this argument is without merit. As noted above, while termination fees are permitted by the FCC, the state regulatory agency has the authority to determine whether these fees should be disallowed. If the CLEC has been enjoying a discounted rate connected with a

volume and term discount, nothing in the TRA's Order prohibits Plaintiff from collecting a pro rata refund of the discount if the contract is cancelled. Plaintiff, however, may not charge any other type of termination fees nor impose any onetime charges associated with providing service for the first time.

Thus, the Court concludes that the TRA acted within its authority in disallowing termination or disconnection fees imposed by Plaintiff. Accordingly, Plaintiff's request for relief from the TRA's Order as to termination or disconnection fees should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 25th day of February, 2011.

William J. Haynes, Jr.
United States District Judge